Mr. Subko. Thank you, Your Honor. May it please the Court, Mark Subko for Cybergenetics. The invention in this case is a never-before-used combination of physical and analytical operations that dramatically improved on existing forensic DNA analysis technology. It made it possible for the first time to efficiently and accurately determine if a criminal suspect's DNA is in a physical specimen containing a mixture of DNA from multiple people. The invention is not abstract. It embodies a specific application of mathematics to provide a concrete solution to a technological problem. And it was far from well understood, routine, or conventional at the time of the invention. The record confirms that Dr. Perlin was the first to solve the DNA mixture problem in this way. My plan today is to focus on application of the Mayo-Allis test. Subject to questions from the Court will rest on our briefing with regard to the District Court's misapplication of the Rule 12b6 standard and its erroneous approach to those issues should have led the District Court to deny ESR's motion to dismiss. Turning to Mr. Subko, this is Judge Taranto. As I read the District Court's opinion and the red brief, the framing there is something like this. We have now repeatedly said that on Allis Step 1, figuring out what the claim is directed to, you look at what the patents make clear is the focus of the claimed advance. What the improvement is that is asserted to be an advance. Here, there are the first four self-evidently physical steps. Get the DNA mixture, amplify the relevant DNA, make signal observations, record them. All of that is, I think, under the patents, undisputedly old. That's what everybody was doing. What the patent does that says is, in fact, an advance is what is a new technique for analyzing the genome. Once you get a certain result, you then compare it to unknown. Why isn't the only thing here that is, in fact, an advance entirely mathematical and, therefore, abstract and, therefore, there's nothing left? Your Honor, even if you were to take the position that the analysis of the genotypes and mixture weights is purely mathematical, there's still a very physical advance here with respect to quantification and accounting for the variance of the amplification process. I don't understand the term, the quantification and accounting as being physical. I thought you're starting with a pool of data, namely the signal representations, and you're trying to figure out what that data means. What's new here is the mathematical analysis tools for figuring out what that data means. That's it. Your Honor, I would submit that the limitations in the claim with respect to the variance of the amplification process is describing and then using something physical. Those four physical steps that you identified create a collection of synthetic copies of genetic material that's then used as a proxy for determining what the genotypes and mixture weights are in the physical sample. In claim one of the 021 patent, for example, element H requires deriving with a computer a data variance of the amplification process. Then when you're determining the genotypes and the mixture weights, you're doing that using a model that includes the data variance value. What that data variance value is is a comparison between the synthetic copies and what would have been expected from a perfect replication process. Nowhere in the prior art was anybody quantifying that difference between the result of the PCR amplification and what would have been expected and then accounting for that when determining what the genotypes in the physical sample are. As a result of not quantifying and accounting for that variance of the amplification process, the results were inherently inaccurate. In the context of criminal forensic science, those types of inaccuracies cause innocent people to be convicted and guilty people to go free. That was a specific physically oriented technological advance that achieved significant improvements in the process compared to prior art DNA analysis technology that didn't do that. That's a physical consideration we would submit, not a purely mathematical consideration. I think it's instructive to take a look at the aspects that you said were purely mathematical, Your Honor. ESR makes much in their brief about the so-called standard linear equation, D equals G times W plus E, that is discussed in the specification and then is employed for determining the genotypes and the mixture weight values for the contributors to that physical specimen. First off, that's not a standard equation. There's nothing in this record that suggests that anyone before Dr. Perlin tried to describe the DNA mixture problem using that particular equation. However, that's a model. What a model is, it's a mathematical way of describing something physical. It's not abstract. It's describing something physical. The D there is the quantitative genotyping data that was produced by the PCR amplification process, a laboratory process. The G represents the genotypes of the actual contributors to the physical sample, the physical DNA sample. The W is the relative contributions, the weight values, the relative amounts of DNA from each of the contributors to that physical sample. And the E here in the context of this invention is that variance of the amplification process that I discussed a moment ago, that equation is describing something very, very physical. It's not an abstract mathematical concept, nor do these claims try to claim either that equation or any other specific mathematical concept. It's a series of steps, very specifically recited, that include physical operations at the beginning, analytical operations that determine what the genotypes and the weight values of the contributors are, and then not just a comparing step, but actually determining whether a particular suspect's DNA is in that original physical sample. So while we're applying mathematics, the claim isn't directed to any particular case. And cases like Diamond v. Deere, cases like TransOva, cases like McRow, they all tell us that it's okay to apply mathematics, as long as you're not claiming any mathematical concepts. And we would submit that's the case here. This case is very much like TransOva. In TransOva, the invention was the application of very a particle separator. The invention, the advance, was the mathematics. There was no change to the particle separator itself. Just like in TransOva, the mathematics here, the analytical operations, achieve an improved result, determining whether a suspect's DNA is in a physical sample, only when they're combined with the other steps of the claim, achieving the same function just in an analytical way, because it's not physically possible to separate out the DNA from multiple people from a DNA mixture. It can only be done analytically. And I'd like to turn briefly to the step two analysis as well. Even if this court were to conclude that the claims are directed to an abstract idea or a mathematical algorithm, which we don't agree is the case, there are at least two inventive concepts that are embodied in these claims. The first is the application of that linear model, the linear matrix analysis that I discussed a moment ago. The patents explain that approaching the DNA mixture problem as a linear matrix equation, which nobody had ever done before, there's nothing in the record to suggest that anyone did that before, it reduced the complexity of the DNA mixture problem to such an extent that a properly programmed personal computer could achieve something that the prior art processes couldn't do with even the most powerful computers. That comes right out of the specification. This is a technological improvement. It's expressly discussed in the specification. There's no contrary evidence in the record. It improved the performance of computer-based DNA analysis technology. ESR completely ignores those limitations in its step two analysis, but the cases that it cites don't say it's appropriate to ignore the mathematical limitations of the claims. The test there is whether or not the claims advance the innovation. It can't be just the novelty of the alleged abstract idea, but a performance improvement provided by the alleged abstract idea certainly can be your inventive concept. Is your view that there's something in TransOva that there actually was no change in anything being done physically? There certainly was in McRow. The physical thing that the human eye saw when watching these animations on the screen, that was actually different by the use of the mathematical or the technique for doing lip syncing. Change in something physical, there was no such change in anything physical in TransOva. In TransOva, the change was in the operation of the particle separator. The particle separator was able to more efficiently, more effectively separate the particles, but the only reason why it was able to do that was because the sophisticated mathematics that were used to program the particle separator. That sounds rather a lot like McRow. Namely, there was a change in the physical operation of something. And I guess what I understand the district court theory to have been and the Redbreeze theory is that this case is different because there is no change in the physical operation of anything. The DNA collection, signal generation, amplification signal generation produces data. That data was produced before this patent. What this patent does in a very useful way, I will assume, is to tell you what that data means, but it doesn't do anything else. Your Honor, I would submit that what the claimed invention achieves here is generating better information about something physical. Better information with respect to the genotypes of the contributors to the physical DNA mixture superior to what the prior art achieved. Similar to in McRow, what was being achieved through the application of mathematics was improving information, visual information, that was presented to the user. More lifelike animation. No, no, no. What the eye detects is not information. It's detecting something physical by definition. The eye is seeing something. The eye does not see information. Information is the abstract character that is taken away from something seen. In McRow, what the eye was seeing was actually different from what it would have seen without the change in animation techniques. I would agree with that, Your Honor. McRow does say that there was nothing tangible about the invention, but I would agree that there was something physical in terms of what was displayed to the user. Here at the culmination of the process that's recited in the claims, we don't just have information that's displayed. Contrary to ESR's argument, there was no display step in this claim. What's done is there is a determination of a genotype for a particular contributor to the DNA mixture, and then using that to make a determination, a real-world determination of whether a particular suspect's DNA was in that physical DNA mixture. In fact, since we're extending, let me ask you a question that's been on my mind from the beginning. I'm tired. Is that right? What sort of relief is being requested? Just damages for past infringement? Yes, Your Honor. That's correct. Okay. All right. Let's hear from the other side. Mr. Vernuk. Good morning. My name is Sergi Vernuk on behalf of the Institute for Environmental Science and Research and Niche Vision Incorporated. May it please the Court, this morning I'd like to, in addition to answering any questions that the Court may have, I'd like to discuss the main points of dispute under the ALICE test, Stage 1, what the claim is directed to, and then Stage 2, the inventive concept, and if there's any time, perhaps a touch on the technological improvement argument. Under Step 1, as Judge Toronto correctly and briefly summarized, the question is, what is the focus of the claim? What is its claim to advance over the prior art? And here, it is just a mathematical algorithm to analyze the DNA data, just as it was in the two Stanford cases. Does the claim require any new data, data that had not previously been amassed? No, Your Honor. If we look at, for example, the O2-1 patent, the patents virtually share the same written description, so I will just focus on the O2-1 patent. In Column 1, for example, it describes that oftentimes you may have a mixed DNA sample that needs to be analyzed, and previously it was done qualitatively, but then the subsequent paragraph says, under appropriate data generation conditions, the peak data can be quantitatively analyzed. And it goes on to say, such quantitative approaches have spawned heuristic and computer-based methods that can potentially resolve these complex data. These prior art statistical computer programs are limited, and then it talks about, references three papers that talk about those prior art computer-based programs to resolve mixture data. So even the idea of using a computer to resolve or deconvolute a mixture, a DNA mixture, that was known. The only improvement here, alleged improvement, is the algorithm that is used to do this analysis. The front-end steps remain the same. The ultimate goal is the same. It's just the only difference is the algorithm that is used to get to that end goal. The specification spans maybe a couple of columns, Columns 3 and 4, just briefly mentioning the front-end steps, and then the rest of it talks about the algorithm. And if we compare the- Can I ask you the following question, and I will apologize in advance for any technical imprecision. So part of the mathematical structure here is putting into matrix form a bunch of equations that could otherwise be written as a series of equations that would have to be solved simultaneously. Another part has to do with what is discussed mostly in Column 14, and some follow-on columns, the more statistical side of things, and in particular, the discussion of-I'm just going to call them several different kinds of variances. And I'm interested, if you can, in your explanation of the variances that are part of-there's a reference to variance in the claim, some slightly different references. And I wonder if you could explain what's going on there. Are these the variances in the usual pool of data? What's the spread, you know, square of the-well, just the spread? Or is there something-are there other concepts of variance that work where you're trying to determine how the data compares to some other information? Certainly, Your Honor. So in Column 14, around line 20, we have the reference to the variance of the data, D. Then in line 44, we have the variance of the mixture weight, W. And then at around line 57, we have the variance of the genotype estimate, B. So from the basic, the core linear equation, D equals GW, the first variance around line 20, that's the variance of the D side on the left side of the equation. I'm sorry. And that variance is just the usual spread measure? Correct. And that is the variance that is recited in the claims. Because, for example, Element H, Step H of Claim 1 of the 021 Patent says, deriving with a computer a data variance. So this variance of the data, that's what is referred to in Column 14, line 20. And when we look at that equation that appears around line 29, it says that this variance really is the difference between the data that we quantified from the sample, subtracted from that matrix, G times W, which is the calculated or what we would have expected to see under our assumed contributor genotypes that are in G, and under our assumed or our set mixture weight, which is in vector W. So that just says, what's the data that we've gotten from the actual DNA mixture, and how far away is it? What's its difference from what we would have expected to get from our calculation based on our assumed genotypes and assumed contributor proportions? Okay. Thank you. Sure. And cybergenetics makes much of these physical laboratory steps, and perhaps one may say those might be the only differences between our case and Stanford, because Stanford, both Stanford opinions, the claims there started with either receiving genotype data or receiving allele data. But those first steps necessarily assumed that certain laboratory steps were done to convert a human's DNA to such data. We humans, we have biological tissues or cells, they need to somehow be converted to the data. So in Stanford, those steps weren't expressly recited, but they were necessary in order to get the data to do the analysis. And so if the result in Stanford, would it really have been any different if the claims expressly recited such steps? The Perkin-Elmer decision cited in our brief and NREBRCA1 decisions, they say no, because both of those cases had claims directed to abstract ideas, even though they had physical data gathering steps at the beginning, like for example, PCR amplification at the front end. And the same goes for the claims in Mayo. Those front end steps, if we allow the claims here to be eligible, find them to be eligible, then really the result would be just based on draftsman's art. You could take Stanford's claims, add some routine, conventional, well-known steps at the front end that cybergenetics claims it didn't invent, that would really turn the result on just draftsman's art. But are you saying that these are all routine, conventional steps? The front end data gathering steps, yes, Your Honor. Those are all routine and conventional, and cybergenetics admits that those were well-known. That's in Appendix 401. Not just the front end, all of the steps? Well, all of the steps include the mathematical algorithm, and that mathematical algorithm, that is what at Step 1 is the claimed advance. And if we were to look at the novelty or the unconventionality of all of the steps, that would be conflating a 102 inquiry with a 101 inquiry, which are separate inquiries. Turning to Step 2 of the ALICE test, we look at what else is there in the claims that could save them. Unlike my counsel, my friend on the other side, the claims don't, I'm sorry, we don't ignore the algorithm steps. We just note that those steps are directed to the abstract idea that cannot provide the inventive concept. The generic computer and the memory that are recited, ALICE says that that is also insufficient to provide an inventive concept. And then lastly, those data gathering steps at the front end, those physical steps, cybergenetics admits that it didn't invent them and that they are well-known, so they also cannot provide an inventive concept. And as I've just mentioned, cybergenetics says, well, the inventive concept is the entire combination. All of the claims taken together, they are unconventional. But again, that misunderstands and confuses a Section 101 inquiry with a Section 102 inquiry. And then lastly... A concern here is that, at least in my mind, it's certainly marginal as far as Section 103. Did the presentations go into Sections 102 and 103? Your Honor, at this stage, procedural posture of the case, they did not because the motion to dismiss was based solely on Section 101, just like it was in Parker v. Luke, for example. So, we have to assume that the mathematics here might well be new, but your point is that doesn't matter because it's the wrong type of thing for purposes of 101, which I think you said before. Yes, Your Honor, that's exactly correct. In SAT America, for example, an advanced, an improved mathematical algorithm is still an abstract idea, same as in the Stanford case is an enhancement to a mathematical algorithm. You keep referring to the Stanford cases, and I don't know what you're referring to. Well, I'm sorry, Your Honor. We submitted a notice of supplemental authority citing those. Okay. Sorry. Yes. There are two recent decisions in Ray Board of Trustees' Stanford. We cited those in our letter of supplemental authority. Those are our decisions or some other court? Yes, Your Honor, this court. Okay. Sure. And lastly, I'd like to just briefly touch on this technological improvement argument. Cybergenetics argues that it can analyze in perhaps seconds trillion, trillion, trillion, trillion possibilities that previously were intractable. One point right away is that argument is untethered from the actual claims. If we read the specification column nine from lines 41 to 57, for example, that is the passage that has that trillion, trillion, trillion, trillion phrase. That says that that's only the case if the analysis is of 15 loci. But the representative claims here, they only require an analysis of one locus, which does not result in that many possibilities. In fact, column 22 of the specification, line 49, says that with just one locus, with the alleles of either three or four, only six possibilities are there. So the representative claims, they don't invoke that dramatic improvement that allegedly was previously intractable, just like in ChargePoint, for example, where the specification full of additional details just ended in broad claims that did not recite those details. The computer itself is not improved. It's just an off-the-shelf PC that remains an off-the-shelf computer. Any improved accuracy is similar to the claim made in the Stanford decisions that they improved the accuracy in their predictions, which was viewed as insufficient. And of course, it's not surprising that cybergenetics would try to fit its case within the framework of the others that were found patent-eligible. But all those other claims, like TransOva that it cited, they recited specific concrete limitations that were unconventional versus just broad, result-oriented, purely functional language. And they actually resulted in an improved laboratory or industrial process. In the software-related claims, they specifically improved basic computer capabilities. But here, as I mentioned, the basic capabilities of a computer remain as they were. No physical results occur, unlike TransOva, which actually physically separated the particles. Here, we just have an improved analysis, like Stanford or SAP America, and the language used in the PCR is just one way of amplifying. But this doesn't say use PCR. It says use any amplification methods. Also, producing from the amplification product a signal with signal peaks. There's more than one way of doing that. I'm sorry. Please finish your thought. Thank you, Your Honor. I was just going to point out that, for example, in the column 3, line 66, it mentions capillary electrophoresis and gel electrophoresis as ways of detecting producing from the amplification product the signal with peaks. But the claim doesn't recite it. It just says, in a functional way, just get those signal peaks however way you can do it. And so, for those reasons, we think that the technological improvement argument is insufficient to render the claims patent eligible. And we ask the court to affirm the district court's decision. Thank you for your time. Okay. Thank you. Any more questions for counsel? No. All right. Mr. Sepko, you have three minutes. Thank you, Your Honor. I'd like to go back to a question that Judge Toronto asked. Is there any new data that's reflected in these claims? And I would submit that there absolutely is, with reference to Claim 1, Element H of the 021 patent, deriving with the computer a data variance of the amplification process from a model that includes both the quantitative genotyping data and the linear combination. There is nothing in this record to suggest that anyone before Dr. Perlin generated that data variance of the amplification process. Yes, it was recognized that the PCR amplification wasn't a perfect process, but nobody before Dr. Perlin quantified that variance of the amplification process by comparing the actual output of the PCR amplification process to what was expected from a perfect replication. And that quantification and then using that in determining the genotypes that were contained in the DNA mixture was entirely new. ESR's counsel referred to the Stanford case a couple of times, the two cases there. The problem with the genetic analysis invention in those cases was there was no practical application. That's what the court said in both of those cases. It was patent ineligible because there was no practical application. Here, even if you assume that there's a lot of math in this claim, the practical application is determining whether a criminal suspect's DNA is in a physical mixture of DNA. There was also some discussion, I think Judge Toronto was asking about different forms of variance of the amplification process. We're not just talking about the spread of data. We're talking about the imperfections in the amplification process. And those are discussed to some extent in the specification. Those are discussed in great detail in our amended complaint. The allegations in the amended complaint talk about the problem with the prior art with respect to data variance, the solution that the invention provided, and the technological improvements that the invention provided. None of those allegations were credited by the district court. So at a very minimum, the district court should not have granted a motion to dismiss because of disputed issues of fact. The inventive concept issue, whether or not the use of the variance of the amplification process and the linear matrix analysis, whether or not they were known, routine, conventional, that's an issue of fact. And the district court resolved that issue of fact against us at the 12B6 stage, which was improper. I'm subject to any other questions from the court. My time is up. Any more questions for Mr. Suffco? No. Thank you. All right. Thanks to both counsel. The case is taken under submission.